**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:   Richard C. Urbealis, Jr.,                    Chapter  7

                                                      Case No.  13-33201 (CMG)

                      Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - -X
Lincoln Financial Advisors Corp.

                      Plaintiff,                      Adv. Pro. No. 14-1080 (CMG)

v.

Richard C. Urbealis, Jr.,

                      Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

WILSON, ELSER, MOSKOWITZ, EDELMAN
Janene M. Marasciullo, Esq.
Attorneys for Plaintiff

BROEGE, NEUMANN, FISCHER & SHAVER
Timothy P. Neumann, Esq.
Attorneys for Defendant

**CHRISTINE M. GRAVELLE, U.S.B.J.**

## I.      INTRODUCTION

        This matter comes before the Court at the request of Plaintiff, Lincoln Financial

Advisors Corporation ("LFA"), for an order, pursuant to §523(a)(2)(A) of the Code,

1

excepting from discharge the obligation of Richard Urbealis ("Debtor") to repay two loans made by LFA. The loans were evidenced by promissory notes signed by Debtor, one dated January 5, 2010 (the "January Note"), and the second dated February 24, 2010 (the February Note"). LFA alleges Debtor induced it to make the loans by making materially false and fraudulent representations regarding his financial condition and his intended use of the funds. LFA further claims the amount set forth in a settlement agreement is exempt from discharge because Debtor entered into the agreement with no intention to abide by its terms.

Following trial, the Court finds the Debtor did not fraudulently induce LFA to loan him funds pursuant to the January Note or the February Note. Further, the Court finds that Debtor cannot be denied a discharge for the amount of the Settlement Agreement because no additional funds or credit were extended to the Debtor through the agreement itself, as required for relief to be ordered under § 523(a)(2)(A).

## II.    JURISDICTION

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended October 17, 2013, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), and (I). Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

## III.    FACTS DEVELOPED AT TRIAL

(i)    The Parties and the Negotiations Leading to the Contract

LFA, is engaged in the business of selling securities through registered representatives who are licensed by the Financial Industry Regulatory Authority ("FINRA"). LFA is affiliated with Lincoln National Life Insurance Corporation ("LMLIC") and Lincoln Life and Annuity Company ("LLAC"), which are insurance carriers. Many of LFA's registered representatives are also insurance agents licensed to

sell insurance.  In this decision, the Court will refer to LFA, LMLIC, and LLAC collectively as "Lincoln."

The facts and allegations set forth in Lincoln's complaint arose from Debtor's business relationship with Lincoln, which lasted less than a year.  Prior to beginning his relationship with Lincoln as a registered representative, Debtor had worked as an insurance professional for over 18 years.  Immediately before his association with Lincoln, Debtor was employed by UNIFI Financial Group, LLC ("UNIFI").  Debtor testified that, according to the terms of his employment with UNIFI, he was to receive an annual salary of $600,000, and an advance of $15,000,000 to establish and operate an agency to sell UNIFI insurance products.  Debtor operated under the name Private Client Group ("PCG") in two locations: 960 Avenue of the Americas in New York City (the "New York office") and Cranford, NJ (the "Cranford office").  UNIFI held the lease for the New York office, PCG leased the Cranford office.

According to Debtor, PCG's relationship with UNIFI began to deteriorate when UNIFI began to gradually reduce PCG's operating budget in early 2009, due to the economic pressures of the global financial crisis of 2008.  These budget reductions resulted in many layoffs for PCG's agents and staff and ultimately resulted in the termination of PCG's relationship with UNIFI in December of 2009.  Nothing about the termination indicated that UNIFI was unhappy with Debtor's performance.  Other testimony about the end of the relationship was consistent with Debtor's testimony that UNIFI's funding reductions caused the termination.

During Debtor's final months with UNIFI, he began to look for other insurance companies where, through PCG, he could enter into a similar business affiliate relationship.  In late summer 2009, Debtor met with Christopher Flint, Head of Advisor and Acquisition Strategy at Lincoln ("Flint"), to discuss the possibility of an arrangement whereby Debtor and PCG would sell Lincoln insurance and investment products.  Flint testified on behalf of Lincoln.  Both Debtor and Flint testified that Debtor provided written information to Flint about PCG's performance at their initial meeting.  One of the documents, titled Agent FYC Production, served as the cover page (the "Cover Page") for 30 plus pages of production reports provided by Debtor.  The production reports, generated by UNIFI, listed "in force" insurance policies sold by Debtor and his affiliated

3

agents during his relationship with UNIFI.  (P. Ex. 58).[1]  Debtor testified that his staff at PCG prepared the Cover Page to provide a quick summary of PCG's structure.  It contained a monthly operations budget, amounts of life premiums sold, and numbers of "Agents/Brokers" affiliated with PCG for the last seven months of 2008 and the first six months of 2009.

The Cover Page contained handwriting that Flint explained were notes he took during the initial meeting.  According to Flint, Lincoln was principally interested in revenue, or "gross dealer concession," and attrition and retention rates in evaluating the overall health of PCG.  Gross dealer concession, as explained at trial, is the revenue generated for a broker-dealer when the affiliated salesperson sells securities or insurance products.  The Cover Page showed that PCG generated approximately $4.6 million in life insurance premiums during the final seven months of 2008 and approximately $3.5 million through the first six months of 2009, with $992,739 in "Submitted Prem."  It stated that PCG had 132 agents/brokers in 2008 and 196 in 2009.  Flint testified that Debtor further explained at their initial meeting that PCG had 60 key producers, 14 of whom were senior partners, and that the key producers generated 70% of PCG's business.  Flint noted this information in the margins of the cover page.  He also made other notations, including "wild card is in the leases," and "self-sustaining in month 6."

Debtor spent a good deal of time at trial describing the breakdown of his relationship with UNIFI.  What he had expected to be a lucrative relationship built on what Debtor described as the largest commitment UNIFI had ever made to a producer, died a painful death as UNIFI pulled back on its financial commitments to Debtor in response to the recession in 2008.  Debtor explained that he had made his own commitments based on UNIFI's promises and had substantially expanded his business, only to be forced to downsize soon after as UNIFI's funding shrunk.  He testified that he shared details of his experience with Flint and noted it was the reason he was looking for a new opportunity.  He testified that he discussed his "hybrid" business model with Flint whereby PCG had relationships with many independent agents/brokers who sold products for many different companies.  His plan was to convince all of the independent

---

[1] References to exhibits admitted at trial will appear as "P. Ex. __" for exhibits introduced by Plaintiff and as "D. Ex. __" for exhibits introduced by Debtor.  Although the text will reference a single exhibit, the same document may also appear in other exhibits.

agents/brokers to concentrate their sales on Lincoln products and to purchase those products directly from Lincoln.  He also explained PCG's trust-owned life insurance business ("TOLI") and testified that he emphasized TOLI's importance to his business model.  Debtor referred to a single page narrative of PCG's business model that contained information consistent with this testimony.  He claimed he provided the single page narrative to Flint at their initial meeting.  (D. Ex. 1).  Flint denied that the two spoke of a "hybrid" model and testified that, following the initial meeting, he was not left with the impression that TOLI was a crucial part of PCG's business model.

Debtor testified that he told Flint that PCG needed to vacate the New York office as Debtor did not trust UNIFI to allow him to remain in the space once he terminated his relationship with UNIFI.  The initial meeting ended with both men planning to finalize the relationship between Lincoln and PCG sometime in the fall of 2009.

Flint and Lincoln spent the weeks following the initial meeting doing due diligence and collecting additional information from Debtor regarding his business practices and financial picture.  Debtor explained to Flint that PCG used Zenith Marketing Group, Inc. ("Zenith") as its brokerage group.  (P. Ex. 17).  Zenith was a third-party brokerage group, serving as "the middle-man" in the sale of products by the primary company to an agent or broker.  Flint explained that, because Lincoln's share of GDC is smaller for products sold through Zenith, and that GDC to Lincoln is maximized when the sales are made directly through Lincoln, he made it clear to Debtor that Debtor would be required to sell Lincoln products directly through Lincoln.  Debtor immediately agreed to terminate his relationship with Zenith, which he did in December 2009 by email to Charlie Collins, Senior Vice President of Zenith.  (P. Ex. 18).  Debtor asked Collins to "release [Debtor] and his producers as brokers under Zenith Lincoln contract."  Debtor's email further states "[a]ll other biz will continue to go through you as before - I just need your release from Lincoln contract…"  Debtor told Zenith in the email that Zenith could email Flint directly and noted that Flint was copied on the email.   The next day, Zenith emailed Flint directly confirming its release of Debtor and PCG "from their Lincoln Financial Group contract" removing any impediment to the purchase by Debtor and PCG of Lincoln products directly from Lincoln.  (P. Ex. 19).

Lincoln prepared projections for Debtor and PCG based on information obtained from them during the course of Lincoln's due diligence.  (P. Ex. 1).  By email dated November 30, 2009, Flint told Debtor that the projections showed "significant pressure on the P&L in the next five years."  (P. Ex. 12).  According to the projections prepared by Lincoln, it expected Debtor and PGC to suffer significant losses during the first five years of their affiliation.  Debtor responded by email explaining he had instituted a system of financial controls at PCG, which included each producer having to pay for his or her own office space.  (P. Ex. 12).  Producers were also required to pay for certain business expenses through a system where each producer was required to input a personal code in order to use the copier and fax machine, or to print out Fed Ex postage.  According to Flint, taken together, the documents and information provided by Debtor demonstrated that PCG was a healthy and profitable business, with solid expense controls in place.

Throughout the negotiation process, Debtor sought transitional financing from Lincoln to cover payroll, moving expenses from the New York office, and other costs. Numerous emails admitted into evidence demonstrated that Debtor repeatedly told Lincoln that he needed new space in New York because Lincoln could evict him at any moment.  (*See e.g.* P. Exs. 3, 4, 8).  Flint did his best to respond to Debtor's requests for financing, certifying in early December that Lincoln was generally committed to providing funds so Debtor could secure a lease.  (P. Ex. 3).

According to Debtor, he had provided Lincoln with everything it sought through its due diligence period and he was frustrated with the time it was taking Lincoln to finalize a contract and provide financing.  He testified that had expected to sign a contract with Lincoln in early December 2009.  He wanted to insure a smooth transition for himself and his agents from UNIFI to Lincoln as the end of his relationship with UNIFI was imminent.  Testimony at trial indicated that the delay in finalizing Lincoln's contract with Debtor was due largely to the fact that December was a busy time for Lincoln's professionals and that year-end vacations prevented a more timely review of the contract. When UNIFI gave written notice of termination of employment to Debtor by letter dated December 28, 2009, Lincoln and Debtor still had not signed a contract.  The General Agent and OSJ Management Agreement between Debtor and Lincoln (the "Contract"), was not signed until February 4, 2010.  Despite the absence of the Contract, Lincoln

6

provided financing to Debtor in January 2010 to allow him to relocate from the New
York office.

      (ii)      <u>The January Note</u>

In addition to his fear of eviction from the New York office, Debtor testified that
he told Flint that under the terms of his broker/dealer, security, and confidentiality
agreements with UNIFI, UNIFI had access to PCG's computer system and all business
information stored on it.  Debtor feared that UNIFI would access PCG's confidential
information when the two agencies started to compete against one another.  UNIFI also
held the lease on the office furniture and Debtor feared that UNIFI could remove the
furniture at any time.  Debtor testified that it was extremely important to PCG's business
that his brokers and agents had a stable and secure space from which to work.

The parties introduced a good deal of correspondence between Debtor and Flint
that disclosed Debtor had been working with JDF Realty in his search for a new office
and which conveyed Debtor's increasing desperation for lease funding.  (*See e.g.* P. Exs.
8, 10, 11 and D. Ex. 4, 5, 6, 9).  He testified to losing opportunities to rent new space
because Lincoln had not made funds available to him.  The testimony and evidence
supported the fact that Debtor was requesting funding so he could relocate PCG's New
York office.  Flint testified that Lincoln committed to providing funding and by email to
Debtor dated December 7, 2010, Flint stated:

> The purpose of this e-mail is to outline a general commitment from
> Lincoln Financial Network (LFN) to make available a onetime loan equal
> to $184,000.  The purpose of these funds is to provide payment for the
> security deposit on the space being leased by Private Client Group, LLC
> and Richard Urbealis (collectively referred to as PCG) from JDF Realty,
> Inc. for the establishment of PCG's agency operations.  (P. Ex. 3).

Flint also communicated directly with JDF Realty, emailing the following on December
24, 2009:

Urbealis is fully approved by Lincoln's CFO for the required lease deposits and additional start-up expenditures needed for his company. Yesterday Lincoln's general counsel and I completed the last amendments to our agreements and had them packaged for delivery to Mr. Urbealis. I apologize for the delays. Please know, it has not been as a result of Mr. Urbealis, but a function of my team's yearend vacations, holiday celebrations, strategy planning and closing the books. Regardless, I assure you we are working diligently to get the needed deposits to Mr. Urbealis and JDF Realty.  (P. Ex. 10).

Flint assured the realtor that Debtor would have the funds no later than the first week of January.  (P. Ex. 8).

On January 5, 2010, Urbealis and PCG executed the January Promissory Note in favor of Lincoln in the amount of $184,000.  (P. Ex. 9).  But Lincoln did not fund the loan until January 14, 2010.  According to Debtor, that was too late to secure the space JDF Realty had found for him.  Debtor testified that he continued to look for space.  By letter dated February 8, 2010, Debtor sent Flint a copy of his termination letter from UNIFI and copies of letters from realtors concerning two more available spaces for a move of PCG's New York office.  (D. Ex 17).

Despite Flint's December 7, 2009, email to Debtor in which Flint stated that the express purpose of the loan was for Debtor and PCG to obtain a new lease on office space, the terms of the January Note included no such restriction.  On cross-examination, Flint agreed that there was no discussion of setting aside the proceeds of the January Note until the Debtor was able to locate new space.  He testified that he assumed the Debtor would use the proceeds only for rental costs.  According to the January Note, it was to be paid in full on February 28, 2013, with the first payment to be made in February 2011.  Flint testified that the repayment dates corresponded to rent holidays in the purported lease.  Termination of the Contract, which, as of the date of the January Note, had not yet been executed, triggered immediate repayment of all amounts outstanding under the January Note.  Security for the January Note included a collateral assignment of insurance on Debtor's life.

Meanwhile, unbeknownst to Lincoln, Debtor was negotiating with and on behalf of UNIFI regarding the New York office.  John Kirtley, assistant general counsel at Union Central Life Insurance Company (a UNIFI company), testified for Lincoln.  Kirtley testified that, contrary to Debtor's allegation that UNIFI wanted PCG out of the

UNIFI space, UNIFI had actually encouraged Debtor to remain in the New York office as it would help UNIFI cover its rental costs.  According to Kirtley, UNIFI had been paying the rent on the New York office and had offered to continue doing do until March 1, 2010, when PCG would have to begin paying rent.  UNIFI also offered to lease or sell the office furniture to PCG.  Following further negotiations, UNIFI consented in writing on February 25, 2010, to let Debtor stay in the New York office rent-free until November 2011.  (P. Ex. 124).  Debtor would then be responsible for the balance of the lease, which was a significant obligation.  Debtor did not share this information with Flint and Flint continued to believe Debtor was under pressure to relocate the New York office.

Debtor testified that he believed UNIFI had breached its contract with him and that he intended to sue UNIFI for damages.  He had no intention of staying in the New York office, despite UNIFI's offers, but continued to negotiate with UNIFI with regard to the lease to protect his position there until he could make other arrangements.  Further, UNIFI's offer of free rent was not made until the end of February; nearly two months after Debtor signed the January Note.  Debtor noted that, even with this offer, he would have to re-fit the New York office, obtain new equipment, and ultimately assume a substantial rent obligation.

Debtor also testified that the owners of the building in which the New York office was located approached him about a potential buy-out of the lease.  Debtor conveyed this information to UNIFI and, at UNIFI's request, attempted to negotiate a termination of the lease for the New York office.  PCG remained in the UNIFI space until August 2010, long after the January Note was disbursed.  Debtor made no payments to Lincoln pursuant to the January Note.

Lincoln introduced evidence to show that Debtor spent the proceeds of the January Note within six weeks of receiving them.  (P. Exs. 46, 79, 81).  According to Flint, Debtor was not authorized to use the proceeds on anything other than rent for a new office space.  At trial, Debtor was not able to answer questions regarding the use of specific expenditures of the proceeds of the January Note.  He testified that his staff handled the accounts and would be more familiar with the specifics.  He added that all of the information requested would be in bank statements maintained on UNIFI computers.  According to Debtor, UNIFI had taken possession of those computers in August 2010.

Debtor testified that he used the proceeds to pay business expenses and that Flint was aware of his use of the proceeds.  He said that he told Flint, during a conversation at the end of December, that he had expected to sign the Contract, which would have provided him with funding, on December 1, 2009.  Since that funding had been delayed, and Debtor had been spending so much time looking for office space, he would have to use the proceeds from the January Note for business expenses.  According to Debtor, Lincoln would be funding his expenses in any event as soon as the Contract was signed and the January Note could be subsumed into the financing associated with the Contract.

(iii)    <u>The Contract</u>

On February 4, 2010, a few weeks after Lincoln disbursed the proceeds of the January Note to Debtor, Lincoln and Debtor signed the Contract.  (P. Ex 25).  In the Contract, Lincoln agreed to provide transition financing for a period of six months in the form of credit advances not to exceed $535,000.  Debtor was to execute the February Note to obtain the financing.  The Contract provided that the amounts to be advanced would not exceed the amounts set forth in a financial model attached to the Contract as Exhibit C.  (P. Ex. 25).  The modeling set forth in Exhibit C began in December 2009, despite the fact that the Contract was not signed until February 2010.  The Contract appointed Debtor …

> on a non-exclusive basis to recommend to [Lincoln] certain third parties ("Affiliated Agents") who will promote the offer and sale of life insurance, annuities, and other insurance (collectively "Insurance Products") and solicit subscriptions for non-insurance product securities ("Securities") offered by or through Lincoln.

The Contract continued,

> [Debtor] hereby accepts such appointment on a non-exclusive basis and agrees to use his best efforts to find Affiliated Agents acceptable to Lincoln who will promote the offer and sale of Insurance Products and Securities.

10

Pursuant to the Contract, Debtor signed the February Note on February 24, 2010, three weeks after signing the Contract.

     (iv)    <u>The February Note</u>

The February Note (included in P. Ex. 25) also referred to Exhibit C to the Contract stating in part, that during the first six months of its term, "amounts advanced to pay expenses of the [Debtor] shall not exceed the amounts provided in the financial model [in] … Exhibit C." The financial modeling contained in Exhibit C is a spreadsheet detailing PCG's projected revenues and expenses. Exhibit C contained a single line item allocation of "$0.00" for "managers' salaries." Lincoln claimed this line item, along with the terms of the Contract, prohibited Debtor from taking any compensation that was not directly tied to a percentage of the sale of a Lincoln product. According to Lincoln, Debtor's compensation arrangement was commission only. Debtor testified to a different understanding of Exhibit C. He believed Exhibit C was added as a general "expense cap" to ensure PCG earned a predetermined amount of revenue before Lincoln would authorize advances from or increases to the line of credit.

Lincoln made three advances under the February Note totaling $314,669.02. An initial advance of $112,788.62 was made the day after Debtor signed the February Note. Lincoln made a second disbursement on April 5, 2010, in the amount of $123,279.51, and a third on April 22, 2010, in the amount of $78,600.89. At trial, Debtor was asked to explain what he did with the advances made by Lincoln. He was shown a number of documents evidencing transfers to unidentified bank accounts, and payments by checks written directly to him and his partners, or used to pay credit card debt for cards held in his name. Debtor was unable to provide detailed answers but claimed all funds were expended on PCG business, which would have included his personal expenses. He testified that there was no "separation of personal versus business" expenses, that he did not keep separate books and records for himself and PCG. He stated that he paid his personal expenses through the PCG business accounts and that there was "no rhyme or reason" as to whether and when he used the PCG checking account for personal or business expenses. He filed a single tax return for himself and PCG. He employed a

CPA full-time and entrusted much of the financial management to PCG staff who met with PCG's accountant on a regular basis.  He testified that he made copies of all tax returns and bank accounts for Lincoln, and that Lincoln had full access to the PCG staff in the New York office and the Cranford office for its review of his financials.  He assumed Lincoln knew how he maintained his records.  He testified that UNIFI had conducted its own audit of Debtor and had no problems.  Debtor stated that he offered all of the documentation relative to the UNIFI audit to Lincoln for its review.

According to the terms of the February Note, the outstanding balance was due to be paid on August 15, 2015 or upon termination of the Contract, whichever first occurred.

(v)     Deterioration of the Relationship with Lincoln

In early March 2010, approximately one week after Lincoln made the first wire transfer pursuant to the February Note, PCG requested another advance under the February Note.  In response, Flint emailed Debtor asking why Debtor needed $123,000.00 for the Cranford office when Lincoln had just advanced a similar sum and noted the payment made by Lincoln "for space not yet occupied by PCG."  Flint's email continued:

> We seem to be operating outside of the P&L we designed with you. My most immediate concern relates to the ambiguity associated with the expenses of the new office and the rate of disbursements we are making with little offsetting GDC.  (P. Ex. 27)

According to the testimony, Lincoln and Debtor continued to discuss the details of their relationship.  A March 24, 2010 email from Flint to Debtor identified various issues for discussion including:

- The concern that Debtor continued to occupy the New York office space and that if he intended to stay at that location, it would have to be registered as a Lincoln branch office and arrangements would have to be made for repayment of the January Note;

- The concern that Lincoln was paying expenses for the Cranford office when it had no registered brokers operating out of that location and that it needed more information about the contributions made to expenses by those brokers; and
- The concern that PCG brokers were selling Lincoln products outside of Lincoln's direct channels. (P. Ex. 28).

Debtor responded promptly and also included a list of his own concerns in a writing he titled "Confidential Memo."  Debtor's "Confidential Memo" raised a number of points, including:

- Debtor's concern that Lincoln was basing its expectations on Debtor's performance on a December 1, 2009 start date when, in fact, the Contract was not signed until February 4, 2010;
- Confusion regarding PCG's ability to continue its relationship with Zenith for non-Lincoln products since Lincoln had given its express permission for this business to continue;
- Reiteration that PCG continued to look for new office space in New York even though UNIFI had "made … a very attractive offer to take over" the New York office;
- The use of the Cranford office by securities brokers <u>not</u> licensed with PCG, and to "house life insurance brokers that PCG could get all their life insurance production" and Debtor's understanding that "[Lincoln] had an open business model that allowed PCG to have 'life insurance brokers' as well as life brokers that would also be securities licensed thru [sic] [Lincoln];"
- The critical nature of PCG's trust owned life insurance program ("TOLI") to PCG's success and need for Lincoln's approval of TOLI.  (P. Ex. 28).

Hearing no response to his Confidential Memo, Debtor e-mailed Flint on March 31st beginning his correspondence with "I must admit I am getting a very bad feeling about this whole deal with Lincoln."  (D. Ex. 21).  Debtor reiterated his concerns and reported on PCG's production, which he stated would be doubled if Lincoln had approved TOLI. Lincoln funded PCG's early March request for an advance on April 5, 2010.  Lincoln made its third and final advance 17 days later.

Subsequent emails between the parties demonstrated that Debtor continued to report his progress to Lincoln.  In an email dated May 5, 2010, Debtor reported that PGC had contracted 27 brokers with Lincoln "and another six in progress."  He admitted being $85,000 short of his goal, but reported additional contracts in underwriting, which

13

contracts were obtained "with outside [Lincoln] business and with [PCG's] Zenith relationship." (D. Ex. 23).

Flint testified to receiving an e-mail from Debtor on August 7, 2010 that included a copy of an email sent by Debtor two days before to his PCG producers. The latter email contained the words "CONFIDENTIAL INFORMATION" at the top of the narrative. In the email, Debtor discusses with his producers changes he expects to implement at PCG and instructs his producers to keep the information confidential, specifically mentioning an incident wherein Flint learned information about PCG that should not have been shared with Flint. The email covers five, single-spaced pages and addresses a number of topics, including:

- Percentage payments owed to PCG on all sales made by the producers, even when the producer has been allowed to keep his contract with another insurance company;
- Proposal for an agreement between PCG and National Securities Corp ("NSC"), which the email states Debtor discussed with Lincoln;
- Status of the New York office whereby PCG would be losing the space and Debtor would be moving to a single office at NSC and housing all PCG staff at the Cranford office;
- Operational issues arising as a result of PCG's merger with NSC. (P. Ex. 36).

The email further states that PCG "is committed to Lincoln production" and Debtor needs "us all to continue to do Lincoln business - that has not changed – we will still continue our relationship with Zenith as well."

Flint testified that the email disclosed to him that Debtor was courting a relationship with another company, which was unacceptable to Lincoln. But, Lincoln also introduced as an Exhibit an email, which Flint testified was dated June 22nd, from Debtor to Lincoln, in which Debtor responded to Lincoln's request for a meeting. (P. Ex. 33). In the June 22nd email, Debtor reported that he was "working hard to get the 'National broker Dealer' opportunity completed over the next several weeks." Debtor asked to postpone the meeting until mid-July because he expected to have the opportunity completed by then, giving him the basis for "a much better convo…with mgmt." Another email from Debtor, dated June 28th and labeled "CONFIDENTIAL

14

INFORMATION," updated Flint about Debtor's meeting with the executive team of National Securities (D. Ex. 30). Debtor concluded his update by stating his belief that "National is ready to move forward with me in some form and will have agreement completed over next two weeks."

Flint testified that, if he had known Debtor intended to continue (i) selling products through Zenith, or (ii) allowing agents at the Cranford office to sell products other than Lincoln products, Lincoln would not have entered into the Contract or would have at least discounted for those agents who were not selling Lincoln products.

On October 8, 2010, Debtor emailed his official broker-dealer resignation to Lincoln. Nothing introduced at trial indicated that Lincoln forced or encouraged the resignation because of dissatisfaction with Debtor's performance. The resignation triggered an acceleration clause contained in both the January Note and the February Note that made the balance of both loans and any accrued interest due immediately. As explained at trial, Debtor owed the full principal balance of the January Note, plus interest. Additionally, although Debtor made no payments on the February Note, Lincoln recovered $53,939.26 through withheld commissions and waived $4,998.49 in principal and $188.96 in interest payments. Debtor, therefore, owed Lincoln a total of $447,657.41 for the loans secured by the January Note and the February Note.

(vi)    Lincoln's Attempts at Collection

Following Debtor's resignation, Lincoln and Debtor appeared to be working together to accomplish repayment but made no progress. In response to the lack of progress, Lincoln filed a Statement of Claim with the FINRA and proceeded with litigation against Debtor. On January 28, 2013, the day before a scheduled arbitration hearing, the parties signed a settlement agreement whereby Debtor agreed to pay Lincoln $559,293.82. Lincoln received a facsimile copy of Debtor's signature and cancelled the arbitration hearing as a result. But Debtor failed to provide the original signed and executed copies of the settlement agreement, claiming he could not agree to the settlement. Debtor made no payments pursuant to the settlement agreement, Lincoln

obtained a judgment against him and, on October 23, 2013, Debtor filed for relief under Chapter 7 of the Code.

Lincoln timely filed this adversary proceeding, submitting a three-count complaint pursuant §523(a)(2)(a) seeking denial of discharge of monies owed by Debtor under the January Note (Count I), the February Note (Count II), and the settlement agreement (Count III).

Debtor counterclaimed alleging that Lincoln wrongfully prevented PCG from using its TOLI program causing PCG to lose a substantial portion of its business, and making it impossible to meet its projections. Lincoln moved for summary judgment on all three counts of its complaint and against Debtor on his counterclaim. The Court granted Lincoln's motion in part, dismissing Debtor's counterclaim. Addressing Debtor's claim that he did not agree to the settlement, this Court ruled that the settlement agreement was valid and enforceable. The grant of partial summary judgment to Lincoln confirmed Lincoln's monetary claim against Debtor. The question of whether the claim was dischargeable was held for trial.

## IV.     APPLICABLE LAW

The main purpose of the Code is to provide honest debtors with a fresh start through a discharge of debt. *See* Grogan v. Garner, 498 U.S. 279, 286-87 (1991); In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995). In keeping with this goal, exceptions to discharge are construed narrowly and strictly against creditors and liberally in favor of debtor. In re Cohn, 54 F.3d at 1113; *see also*, Caspers v. Van Horne, 823 F.2d 1285, 1287 (8th Cir.1987) ("[e]vidence presented must be viewed consistent with congressional intent that exceptions to discharge be narrowly construed against the creditor…"); In re Hunter, 780 F.2d 1577, 1579 (11th Cir. 1986), *citing* Gleason v. Thaw, 236 U.S. 558 (1915) (exceptions to discharge to be construed strictly). But, a debtor who has committed fraud under the code is not entitled to the benefit of this narrow construction. In re Cohen, 106 F.3d 52, 59 (3d Cir. 1997), *aff'd*, 523 U.S. 213 (1998).

Section 523(a)(2)(A) of the Code operates to deny discharge of a debt fraudulently obtained. That section provides:

> (a)    A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt -
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
> >
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C § 523(a)(2)(A).

In applying § 523(a)(2)(A), courts typically require proof that the debtor: (a) obtained money, property or services; (b) after falsely representing a material fact, opinion, intention or law; (c) that the debtor knew at the time was false (or was made with reckless disregard for its truth); (d) the debtor intended that the plaintiff rely on that statement; (e) the plaintiff actually relied on that statement and the reliance was justified; and (f) the plaintiff sustained damages as the proximate result of the false representation. *See* In re Purington, 2012 Bankr. LEXIS 2478, at *29 (Bankr. D.N.J. May 30, 2012). The burden lies with the creditor to prove each element by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 291 (1991).

Intent is a required element of § 523(a)(2)(A).  *See* In re Giquinto, 388 B.R. 152, 165 (Bankr. E.D. Pa. 2008).  Any successful allegation of fraud, whether it be false pretenses, false representation, or actual fraud, requires proof that the debtor acted with intent to deceive.  *See* id., *citing* In re Ojeda, 2008 Bankr. LEXIS 1203, 2008 WL 1883221, at *11 (Bankr. N.D. Ill. Apr. 22, 2008).  Determining whether a debtor had the requisite fraudulent intent to warrant an exception to discharge is a subjective inquiry.  In re Singh, 433 B.R. 139, 161 (Bankr. E.D.Pa. 2010).  A creditor may prove such fraudulent intent by direct or circumstantial evidence and infer intent and knowledge from the totality of the circumstances.  *See* id.  A common way of proving intent to deceive is to show that a debtor entered a contract without intending to fulfill its terms. In re Wiszniewski, 2010 Bankr. LEXIS 2894, 2010 WL 3488960, at *5 (Bankr. N.D. Ill. Aug. 31, 2010); *see* In re Balzano, 127 B.R. 524, 531 (Bankr. E.D.N.Y. 1991) ("[a]

fraudulent promise under § 523(a)(2)(A) requires proof that at the time the debtor made it, he or she did not intend to perform as required.").

Finally, to be actionable, the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment, or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient. *See* In re Purington, 2012 Bankr. LEXIS at *26-27, *citing* In re Bailey, 34 Fed.Appx. 150, *1, 2002 WL 494325 (5th Cir. 2002); In re Reath, 368 B.R. 415, 422 (Bankr. D.N.J. 2006); In re Schwartz & Meyers, 130 B.R. 416, (Bankr. S.D.N.Y. 1991); In re Giquinto, 388 B.R. at 166.

The reliance element of § 523(a)(2)(A) requires justifiable, not reasonable, reliance. *See* Field v. Mans, 516 U.S. 59, 73 (1995). "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Id. at 70 *quoting* Restatement (Second) of Torts (1976), § 545A, Comment b. The Supreme Court explained that "a person is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation...'" *See* id., *quoting* Restatement (Second) of Torts (1976), § 541, Comment a. Another court noted that a plaintiff cannot ignore obvious "red flags," or "warning signs," that the specific representation is false or that specific material information has been omitted. In re Strauss, 523 B.R. 614, 632 (Bankr. N.D. Ill. 2014).

## V.   **APPLICATION OF LAW TO FACTS**

Lincoln sets forth three counts in the Complaint, each of which seeks relief pursuant to Code §523(a)(2)(A).  We will address each Count of the Complaint in turn, beginning with Count I, in which Lincoln alleges Debtor obtained funds pursuant to the January Note through false representations and false pretenses.

    (i)    Count I (Non-Dischargeability under 11 U.S.C. § 523(a)(2)(A)
                 Related to the January Loan)

There is no dispute that Debtor represented to Lincoln that he needed funding to acquire new office space in New York City. Debtor signed the January Note on January 5, 2010. Nine days later, Lincoln disbursed the funds to debtor. By then, the space JDF Realty had found for him in December had been rented and was no longer available. The testimony is not clear as to when Debtor and Lincoln learned that Debtor had lost the opportunity to rent the office space, but subsequent emails between the parties demonstrate that Lincoln had been advised that the space had been lost and that Debtor continued to look for new space. Debtor introduced letters, dated early February 2010, between his realtor and other potential landlords to support his testimony, along with an email to Flint in which he shared copies of the letters. (P. Ex. 26).

The Court finds Debtor's testimony with regard to his intention to vacate the New York office credible. When he signed the January Note, Debtor intended to move out of the New York office and needed funding to do so. The fact that he continued to negotiate with UNIFI through John Kirtley does not change this Court's finding. It is understandable that Debtor would want to maintain a positive working relationship with UNIFI until he could sever all ties. It does nothing to prove that Debtor never intended to vacate the New York office.

UNIFI made its first offer to allow Debtor to remain in the New York office on January 28, two weeks after the January Note was signed and funded. It did not make its offer that Debtor could stay rent-free until late February. It is important to note that the latter offer, UNIFI's best, which allowed suspension of rent until November 2011, also required significant concessions from Debtor. Ultimately, he would be obligated to assume the lease for the New York office for the remainder of its term. Debtor credibly testified that was not prepared to make that commitment.

This evidence establishes that Debtor knew that he would not be immediately evicted from the New York office space as of January 28, 2010, but it does not establish that Debtor's earlier fears of eviction were unfounded. It also does not establish he trusted UNIFI to provide him with quiet enjoyment of the New York office thereafter. Indeed, Debtor had been in negotiations with Lincoln for a loan for a down payment on a

new office weeks before he learned that UNIFI would allow him to remain in the New York office.

Further, the Court finds Debtor had no obligation to inform Lincoln of his negotiations with UNIFI with regard to the New York office.  In any event, Debtor did not appear to be hiding from Lincoln the fact that UNIFI had offered the New York office to him rent-free for a time.  Debtor's subsequent emails to Flint refer to UNIFI's "very attractive offer to take over" the New York office.  Ultimately, despite the "very attractive offer," Debtor vacated the New York office in August 2010, despite the fact that UNIFI offered free rent through November 2011.

The Court finds credible Debtor's testimony regarding the effect the deterioration of his relationship with UNIFI had on him.  Debtor's association with UNIFI, which promised to be a very lucrative one, was short lived through no fault of Debtor.  He did not trust UNIFI and intended to sue UNIFI.  His belief in his need to sever ties with UNIFI to protect himself and his brokers was reasonable.  Both parties offered into evidence UNIFI's December 28, 2008 letter to Debtor, which terminated his employment.  (P. Ex. 26; D. Ex. 16).

The Court entered into evidence several email correspondences between Debtor, Flint, and JDF Realty that show that Debtor was actively engaged in finding new office space after the January Note was disbursed.  Lincoln argues that Debtor had no intention of leaving the New York office and implies that these communications were an intentional scam by Debtor used to trick Lincoln into continuing its financial support through the January Note.  But, other than the fact that Debtor did not use the proceeds of the January Note for rent, Lincoln provided no evidence to show that Debtor's communications with his realtor were made for the express purpose of defrauding or misleading Lincoln.

Debtor testified that, when the original space located by JDF Realty fell through, and there was still no indication of when he would be provided with the Contract or the February Note, he had to use the funds advanced under the January Note for business expenses.  He claimed he alerted Flint to this use and that Flint did not object.  Debtor suggested that the sums advanced under the January Note be rolled into the February Note, as both notes represented Lincoln's funding of Debtor's business.  In fact, when his

relationship with Lincoln ended nine months later, Lincoln had not disbursed the full amount of the February Note.  Debtor owed less under the January Note and February Note than the total amount Lincoln had agreed to advance under the February Note.

Flint rejected Debtor's suggestion that the funds advanced under the January Note be included in the February Note, insisting that the two notes constituted separate agreements.  He made his position clear to Debtor as shown in various emails.  (P. Exs. 2, 23).  But, even though Lincoln questioned Debtor about his use of the proceeds of the January Note in light of the fact that Debtor had not changed office locations, Lincoln did not insist on repayment of the January Note until the relationship ended with Debtor's voluntary resignation in October 2010.  And, the fact that the total due under both notes was less than the sum of advances contemplated in the February Note, lends credibility to Debtor's testimony that the balance due under the January Note could be rolled into the February Note.  While Flint and Debtor disagreed that Lincoln would consolidate the two notes, in effect, consolidation was the result.   In the end, Lincoln's loan to Debtor as evidenced by the January Note did not increase Lincoln's exposure because, intentionally or not, Lincoln never fully disbursed the amounts it had agreed to disburse in the February Note.  The Court finds no fault in Lincoln's failure to fully disburse the February Note proceeds.  It merely notes this circumstance as another factor supporting its conclusion that Lincoln did not meet its burden of proving that Debtor acted with intent to deceive when he signed the January Note and received its proceeds.

The Court reaches its conclusion without the benefit of the testimony of Dennis Kelleher, a witness offered by Debtor.  In a January 6, 2010 email to Flint, Debtor stated that a "friend" from UNIFI had called and told him that he could be evicted from the New York office.  (D. Ex. 14).  The "friend" was later identified by Debtor as Kelleher, a former UNIFI employee who had been terminated in August 2009.  On cross examination, Lincoln called Kelleher's testimony into question by establishing that Kelleher had no communication with UNIFI after he was terminated and that he had no knowledge of the terms of the lease agreement between Debtor and UNIFI.  Lincoln effectively challenged the reliability of Kelleher's statements.  But, as stated above, this Court finds that Debtor's perceived need to vacate the New York office was reasonable and believable based on Debtor's own experience with UNIFI.  Lincoln failed to establish

that Debtor had no intention of moving out of the New York office to protect himself and
his business.

(ii)    <u>Count II</u> (Non-Dischargeability under 11 U.S.C. § 523(a)(2)(A)
Related to the February Loan)

Debtor signed the Contract on February 4, 2010, more than a month after his
employment with UNIFI terminated and, according to trial testimony, approximately two
months later than the parties had expected to sign.  The February Note, signed on the 24th
of that month, represents Debtor's obligation to Lincoln for transition financing as
defined in the Contract.  (P. Ex 25).  The February Note contemplated a line of credit of
up to $535,000.00.  Lincoln made advances to Debtor as late as the end of April 2010,
well after Lincoln knew that Debtor had neither relocated his New York office nor made
any attempt to repay the January Note.  Lincoln received partial repayment of the sums
advanced to Debtor pursuant to the February Note during the course of Debtor's
relationship with Lincoln.

At trial, Lincoln highlighted a number of areas in which, it alleges, Debtor
deceived it into entering into the Contract and extending credit under the February Note.
The areas identified can be summarized as (a) misrepresentations made at Debtor's initial
meeting with Flint; (b) subsequent misrepresentations made during the due diligence
period such as Debtor's description of the financial controls on expenses he used in his
business; (c) Debtor's failure to use the money advanced by Lincoln in the way he had
agreed to use it; and (d) Debtor's promise that he would no longer use Zenith as the
"middle-man" to purchase insurance.  According to Lincoln, Debtor's actions or
inactions in these areas make the balance due under the February Note non-
dischargeable.

(a)  Misrepresentations Made at Initial Meeting

First, Lincoln points out that the Cover Page contained significant inaccuracies.
Most troubling to the Court is the notation on the Cover Page that Debtor had 196

producers in the first six months of 2009.  But, it appeared from the Cover Page that
Debtor's number of producers had increased since 2008 where he listed 132 producers
during the last seven months of that year, even though the revenue numbers for those
periods had decreased significantly.

Flint testified that the large number of producers was an important consideration
for Lincoln as it represented solid growth in Debtor's business and would represent
significant sales that would inure to Lincoln's benefit.  Flint's notes on the Cover Page
emphasize the importance of this information to Lincoln.  He did not address the obvious
reduction of income.  It is also clear to the Court from Flint's testimony that he did not
understand that Debtor was associated with brokers who sold products for other
companies and that Debtor had no control over a number of those brokers who purchased
Lincoln products through third parties like Zenith.

At trial, Debtor testified that, around the middle of 2009, while he was still
working at UNIFI, the New York City office had about 20 employees, half of whom were
staff and half producers.  In Cranford, he had 40 employees with more producers than
staff.  Debtor's testimony contradicts the type-written information provided on the Cover
Page, and is a closer match to Flint's handwritten notes that refer to "60 key producers."
Nevertheless, Flint's testimony made clear that he relied on the representation that Debtor
had 192 producers, and that his notes regarding 60 was a subset of the total number.

While, according to Flint, Lincoln was not aware that Debtor had associations
with broker/producers who sold Lincoln products but over whom he had no control, it did
not appear that Debtor intentionally kept this information from Lincoln.  Throughout the
trial, Lincoln and Debtor appeared to disagree on the definition of the term "producer."
This disagreement permeated and supported much of the conflicting evidence.  Debtor
testified that he had two types of producers, registered representatives and independent
life insurance agents.  He claimed that the first type were registered "under Lincoln's
broker/dealer" and could be controlled by PCG.  *See* 2/24/26 TT, p.119.  The latter type
was not "securities licensed" and "could go anywhere and do their life insurance
business."  *See* id.  According to Debtor, PCG hoped to earn the business of the latter
group for Lincoln.

It appears that this method of doing business was not new to Debtor. Both Debtor and Flint testified to discussing Debtor's "hybrid" business model. While there was a clear misunderstanding between the two about the parameters of Debtor's "hybrid model," the Court cannot find that Debtor intentionally misled Lincoln about his business methods.

The Cover Page also clearly shows that Debtor's revenue had shrunk by $1,000,000 from 2008 to 2009. It is nonsensical that Debtor's revenue could decrease so dramatically at the same time his producer numbers appeared to increase just as dramatically. At the very least, the inconsistency should have triggered questions from Lincoln. Lincoln's argument that Debtor misrepresented the overall health of his business by relying on the Cover Page is without merit.

Debtor testified that his experience with UNIFI was a bad one and was very detrimental to his business prospects. At the outset, UNIFI covered $450,000 in monthly expenses for PCG, which UNIFI lowered several times in 2009 in the wake of the recession. Ultimately, UNIFI reduced Debtor's budget to $175,000 per month in April or May of 2009. It is clear that this budget reduction resulted in substantial layoffs. Debtor testified that he explained much of this to Flint. Debtor testified that he pushed to close the deal with Lincoln sooner rather than later in order to save what producer relationships he could as quickly as possible. E-mails introduced at trial by both parties showed that Debtor often emphasized to Flint his need to complete the contract with Lincoln to provide a safe place for his producers. (*See e.g.* D. Ex. 14, P. Exs.7, 10).

While Debtor may have had approximately 196 Agents/Brokers at one time prior to UNIFI's cutbacks, he did not have that number when he met with Flint. But, at the time he submitted the Cover Page to Flint, the employee numbers were far from accurate. In light of the disclosed revenue loss and subsequent due diligence of Lincoln, Lincoln did not meet its burden of proving that Debtor intended the misrepresentation to convince Lincoln to contract with him. If Debtor wanted to defraud or deceive Lincoln with the Cover Page, he would not have disclosed his substantially reduced revenues from 2008 to 2009.

Finally, the Cover Page cannot stand alone as the only information relied upon by Lincoln. Attached to the Cover Page were more than 30 pages of reports generated by

UNIFI that contained production information attributable to Debtor and his producers. Further, Debtor testified that he was not asked to bring any written materials with him to the initial meeting.  Despite this, he asked his staff to prepare brief informational materials that he could share with Flint.  Besides the Cover Page, he provided Flint with a narrative summary of PCG and its business structure, which included a discussion of the "Alliances" used by PCG in its business model.  (D. Ex. 1).  These Alliances formed part of PCG's "hybrid" business model.

(b) Misrepresentations Made During Due Diligence

Lincoln had plenty of time to conduct due diligence as it did not advance money to Debtor until it disbursed funds pursuant to the January Note and did not advance any transitional financing until late February.  Flint testified as to the due diligence conducted by Lincoln.  Debtor testified that he gave Lincoln full access to his offices and staff, that he complied with every request made by Lincoln and provided copies of his own bank statements as well as those of his business.  He provided copies of his tax returns to Lincoln, and explained that he reported his business income and expenses on his personal tax return.  He testified that he and PCG were one in the same and that he paid personal bills through the business accounts.  He testified that he never kept separate records of his business and personal expenditures, but left it to his accountants to allocate income and expenses between the individual and business at the end of the year for tax purposes. These business practices should have been clear to Lincoln when it reviewed Debtor's books and records before it entered into the Contract.

Flint testified that Lincoln prepared financial projections based on information it obtained from Debtor and PCG that showed Debtor's profitability fell short of expectations, showing significant losses.  When Flint asked Debtor about these shortfalls, Debtor explained how PCG controlled expenses by charging its producers for the use of office space and equipment.  Debtor told Flint that each producer had a code that needed to be entered when he or she used the copier, fax machine, or needed to print out Fed Ex postage.  (P. Ex. 12).  According to Flint, Debtor misled him to believe that the reimbursements generated by this cost-sharing would offset any shortfall.  But, the

estimated amount of reimbursements Debtor provided to Flint were insignificant
compared to the losses demonstrated in Lincoln's financial modeling.  Taking Debtor's
estimates as true, they would have done little to eliminate the losses predicted by Lincoln.
It is unreasonable to assume Lincoln would have accepted the information provided by
Debtor as an assurance that Lincoln's concerns about its own projections had been
sufficiently addressed.

Debtor's bookkeeping procedures, or lack thereof, also contributed to Lincoln's
difficulty in carrying the burden to prove that Debtor spent Lincoln funding on
unauthorized items.  While Lincoln did a thorough job of introducing evidence that PCG
wrote numerous checks directly to Debtor or to make payments due on Debtor's vehicle
or credit card bills, Debtor testified that he often paid business debt directly or used his
personal credit cards to pay business debt.  He implied that the payments were
reimbursements for business debts he had paid.  Debtor readily admitted that he treated
the PCG business account as his own and left it to his accountant to allocate personal and
business income and expenses at year end.  He stated that because his business was
registered as an LLC and he elected to have all his business revenue flow through to his
personal income tax return, distinguishing between his personal and business expenses
was unnecessary.  No evidence was introduced to show that Debtor began this practice
only when he received funding from Lincoln.  It appeared that Debtor merely continued
handling his funds in the same manner as he had always done.  There is no indication that
he attempted to hide any of this from Lincoln during due diligence.  While not the best
financial practice, it does not prove any intent to mislead Lincoln and it cannot support a
finding of non-dischargeability.

It was clear from Debtor's testimony that he and PCG had income in addition to
the funds provided by Lincoln.  No effort was made to determine how much of the other
income was used to pay Debtor's personal or business expenses.  Even if Debtor violated
the spending limits set forth in the spreadsheet attached as Exhibit C to the Contract, the
evidence of a breached spending cap does not prove he had no intention of fulfilling his
obligations under the Contract or of repaying all sums advanced under the February Note.

Lincoln alleges that the Contract required Debtor to use all money obtained from
Lincoln to pay expenses related to Lincoln business, but that Debtor's subsequent

conduct demonstrated that he had no intent to abide by that promise. Both the Contract and the February Note contain clauses that set out a budget and spending limits, which were tied to a spreadsheet of projected revenues (P. Ex. 25, Ex C). The spreadsheet is entitled "Private Client Group Projected Income Statement" ("Exhibit C"). It includes a line item for "Management Salaries/Benefits" that lists "0" for each of the first six months. Lincoln points to Exhibit C as a clear agreement that Debtor was to receive no compensation during the first six months of their relationship. Debtor's explanation of his understanding of Exhibit C was confusing. He described himself as an "owner" of PCG, not a manager. He explained that, as an owner, he did not receive a salary, possibly implying that the line item did not apply to him? He described Exhibit C as a "moving target" and that he expected it to be amended once PCG's production revenues started to rise, which according to Debtor is a common industry practice. It was unclear from the evidence presented whether disbursements made by Debtor were actual compensation to him, or whether they constituted reimbursement of expenses. Further, Debtor did generate some sales through Lincoln and could have presumably received compensation from these sales. The evidence of disbursements made by Debtor was not sufficient to deny discharge.

Further, Debtor argued that Exhibit C had an effective date of February 4, 2010, but that the projections in the exhibit began in December 2009, nearly three months before Lincoln made the first advance under the February Note. Debtor testified that this delay hurt his performance under the Contract and set Lincoln's expectations unreasonably high. He claimed Lincoln began to complain in March that he was not meeting the Exhibit C projections (which, according to Exhibit C, would have shown the debtor four months into the Contract), when he had been given less than two months from the effective date of the Contract, and only about one month from the first advance under the February Note, to meet the projections.

The Court found it informative that Debtor responded to Flint's March email questioning Debtor's actions with questions of his own. (P. Ex. 28). In Debtor's two and one half page, single spaced "Confidential Memo" to Flint, Debtor summarized his view of the history of the Lincoln-PCG relationship to date, noting that the two entities had been in business for only seven weeks at that point. He attached PCG's production

figures and noted that "[c]urrently, PCG has contracted 19 producers with [Lincoln]…"
The Confidential memo states Debtor's understanding that Lincoln knew and approved of
PCG's continuing relationship with Zenith for the purchase of non-Lincoln products.  It
addresses PCG's use of the Cranford office, which included space for insurance brokers
who held securities licenses with broker dealers other than PCG.  Debtor notes that
Lincoln's compliance officer had visited the Cranford office and reported no issues with
its office structure.

In the Final Note of the Confidential Memo, Debtor tells Flint that "PCG made it
very clear before entering into agreement with [Lincoln] that our TOLI program was
critical to the success of PCG."  He expressed his concern that Lincoln had still not
approved PCG's use of the TOLI program.  In an apparent attempt to explain that PCG's
relationship with UNIFI ended on a positive note, he tells Flint:

> UNIFI has made me a very attractive offer to take over the current office lease in
> NYC, whereby they will turn over all furniture/equipment at a deep discount.  To
> my knowledge, I am the only "tier 1" former GA that has been given a favorable
> offer from UNIFI and not involved in litigation.

The Confidential Memo does not disclose every detail of UNIFI's lease assumption offer,
but Debtor had no obligation to disclose them.  He refers to only 19 producers, a far cry
from the 192 number listed on the Cover Page.  It is not clear whether Lincoln responded
to the Confidential Memo, although Lincoln made two more advances to Debtor under
the February Note.  The parties introduced e-mails that demonstrated Lincoln continued
to be concerned with Debtor's production, some of which emails were attempts to
arrange a meeting in June 2010 to discuss the relationship.

Despite Flint's concerns, Lincoln made additional advances under the February
Note subsequent to its receipt of the Confidential Memo.  Flint testified that Lincoln's in-
house counsel advised him that failure to make additional advances to Debtor would be a
breach by Lincoln of the Contract.  It is difficult to understand this position.  If Lincoln
believed that Debtor was clearly in breach of his own promises, why would Lincoln have
any obligation to continue to fund him?  By April 2010, Debtor remained in the New
York office despite the facts that Debtor had been insisting he had to change locations for

more than four months, and Lincoln had loaned him the funds to do so two months before.  If Lincoln believed in good faith that Debtor was not performing under the Contract, and was not using the Lincoln advances under the February Note as required, it should not have been required to continue funding.

Lincoln made much of an email dated August 5, 2010 from Debtor to his producers that was titled "Confidential Information."  (P. Ex. 36).  Apparently Flint, who was not meant to see the email, received a copy by mistake as it was included in a transmission sent by Debtor to Flint later that month.  The email warned PCG producers not to share information about "the many changes that are being contemplated" within PCG with anyone at Lincoln.  It reminded the producers that they owed a commission to PCG on every sale they made during their association with PCG regardless of whether they maintained relationships with other companies.  It also discussed Debtor's plan to ally with National Securities Corp and form a new company.  It appears from the email that Debtor believed an alliance with National Securities Corp would provide PCG with greater marketing opportunities and that PCG could employ the TOLI program that had not yet been approved by Lincoln.

This Court sees the August 5 email as consistent with Debtor's "hybrid" business model whereby he employed "alliances" as part of his plan.  Further, the email appears to include Lincoln in the new alliance.  Debtor states he has to "talk to [Lincoln] re its sales force that can be used outside the greater NYC area that can be deployed immediately at each NSC branch."

More importantly, Debtor introduced into evidence an email he wrote to Flint at the end of June, more than a month before Debtor wrote the August 5th email, which summarized Debtor's meeting with the executive team of National Securities.  (D. Ex. 30).  In it, Debtor told Flint that he "believe[d] National is ready to move forward with me in some form and will have an agreement completed over next two weeks."  The email discussed "building out a 'national' insurance platform similar to UBS" and "building a CPA and other 'alliance' platform to help… National build new revenue generating marketplaces."   This is inconsistent with the implication that Debtor was trying to hide a new business alliance from Lincoln.

Lincoln also asserts that Debtor never intended to abide by the disbursement terms of the February Note, which stated that PCG had to produce a certain amount of GDC before Debtor would receive the next installment of funds from Lincoln. As discussed, Debtor stated that this provision was a "moving target."  Lincoln certainly had control over disbursements under the February Note.  If funds were disbursed out of the formula, it would have been because Lincoln chose to do so.  The fact that Lincoln made the disbursements leads the Court to believe that Debtor's explanation of a "moving target" is a reasonable one.

(c)  Misuse of Funds Advanced by Lincoln

Lincoln contends that Debtors never intended to abide by other spending limits set out on the spreadsheet.  Lincoln cites Debtor's actions of writing himself large checks and making several personal credit card and car payments with the Lincoln loan money, as evidence of Debtor's fraudulent intent when he signed the January Note, Contract, and the February Note.  Debtor admitted that PCG made payments for his personal car and that there was no "rhyme or reason" to whether he paid for many of his personal expenses using his personal funds or through the PSG account. As previously stated, Debtor's primary justification for such disorganized and chaotic spending practices was that he did not have to distinguish between personal and business expenses because all expenses were accounted for on the same tax return (P. Ex. 60 pg. 77-80).  Debtor also stated that the numerous checks he wrote to himself were likely either for reimbursement expenses or his own salary.

At trial, Lincoln asked Debtor a number of questions about transfers from PCG business accounts ending in 6424.  Debtor was unable to identify that account.  Instead, he named the PCG employees who could probably do so.  But, Lincoln failed to introduce further evidence about the account number ending in 6424 and the Court is unsure what this line of questioning was meant to prove other than the fact that Debtor's personal record keeping was less than adequate.  But, Debtor's accounting practices were open for Lincoln's review long before Lincoln advanced funds or entered into the Contract.

Debtor testified that he relied on his staff and his CPA to keep the records straight.  As previously discussed, Lincoln was in complete control of disbursing the funds from the February Note, not Debtor.  Lincoln does not allege that Debtor hid his use of the funds.  In fact, the evidence indicated that Debtor opened his books and records to Lincoln.  If Lincoln believed Debtor failed to meet certain revenue benchmarks under the Contract, it could have refused to make additional disbursements.  Lincoln made additional disbursements after it raised questions about Debtor's performance and never terminated its contract with Debtor.  Instead, the evidence shows that it was Debtor who terminated his broker dealer relationship with Lincoln in October 2010.  (D. Ex. 31).  By that time, Debtor had been out of the New York office for several months.

(d) Misrepresentation of Relationship with Zenith

Lincoln claimed Debtor represented that he and his producers would purchase Lincoln products directly through Lincoln and not through a third-party marketing agent like Zenith.  Trial testimony established that several of Debtor's insurance brokers continued to place orders for Lincoln products through Zenith or other intermediary sellers.   This occurred despite the fact that Debtor sent an email to Zenith seeking a release from any obligation that he purchase Lincoln products through Zenith.  Zenith readily granted Debtor's request, releasing Debtor from his obligations to Zenith vis-à-vis Lincoln.  Debtor encouraged Zenith to communicate directly with Flint on this issue.

Debtor's e-mail to Zenith is consistent with the structure of Debtor's hybrid business model.  In it, Debtor states that he only sought to be released from the Zenith contract for Lincoln products so that all business for those plans could go directly through Lincoln.  He also states that "all other business" will continue to flow through Zenith.  (P. Ex. 18).  Flint was copied on this email and Debtor asked Zenith to copy Flint on the release.  It appears that although Zenith released Debtor from his obligation to buy Lincoln products through Zenith, certain producers associated with Debtor continued to purchase Lincoln products through Zenith.  Debtor explained that he could not control the actions of all of the producers with whom he associated, but that his goal was to convert all producers to Lincoln business production.  He testified that he discussed this issue

31

with Flint.  This testimony, combined with the fact that Debtor encouraged Flint to communicate directly with Zenith, supports Debtor's position that he had no intent to defraud or mislead Lincoln.

The language of the Contract can be read to support Debtor's testimony that Lincoln was aware of and accepted his hybrid business model.  (P. Ex. 25).  Paragraph 1 of the Contract states:

> Lincoln hereby appoints [Debtor] on a non-exclusive basis to recommend to [Lincoln] certain third parties (the "Affiliated Agents") who will promote the offer and sale of life insurance, annuities and other insurance … and solicit subscriptions for non-insurance product securities also offered by or through Lincoln…

The two sentences that follow refer to the extent of Debtor's authority granted under the Contract, then declares:

> [Debtor] hereby accepts such appointment on a non-exclusive basis and agrees to use his best efforts to find Affiliated Agents acceptable to Lincoln …

Following Debtor's acceptance of the non-exclusive agency, the Contract recites:

> [Debtor] acknowledges that no territory is exclusively assigned to him hereby, and that Lincoln may enter into agreements with other third party agencies and broker-dealers providing for the sale of [Lincoln products].

Lincoln argues that the "non-exclusive" language refers to geographical territories only, not to the companies Debtor would be allowed to represent.  Lincoln argues the Contract restricts Debtor to the sale of Lincoln products only, and that it does not provide Debtor with a territory in which to sell them.  Debtor testified to a different understanding of the Contract.

The Court finds the Contract unclear on this point, especially in light of the conflicting interpretations presented at trial.  Nowhere does the Contract state that Debtor cannot sell any products other than Lincoln products.  Debtor testified that he believed the Contract incorporated his hybrid business model, which allowed associations with many different producers selling products for various companies.  In the Contract, the

Debtor first accepts his appointment to Lincoln on a non-exclusive basis, then acknowledges that he has no specific territory in which to sell Lincoln products. These provisions appear to support Debtor's interpretation that his existing business model complied with the Contract.

Debtor credibly testified that he had a policy of grandfathering in the prior insurance purchasing methods used by his agents as long as they paid an override to PCG. He distinguished producers who were registered representatives under the Contract, from those who were not registered. He explained that registered representatives who were under his direction did not place any orders for Lincoln products through any other third party. On the other hand, representatives that were not registered with Lincoln were independent life insurance agents that did not have to abide by PCG's rules. Debtor testified that the non-registered representatives were the ones that placed their orders for Lincoln insurance products via third parties. He claimed that he had explained to Flint that Lincoln and PCG would be working together to convince those representatives to become registered under the Contract. Once they were registered under the Contract with Lincoln, Debtor could direct them to place their orders through Lincoln, eliminating Zenith. This explanation appears consistent with Debtor's contractual agreement "to use his best efforts to find Affiliated Agents acceptable to Lincoln." At a minimum, when taken together, the language of the Contract, along with Debtor's credible testimony, cloud Lincoln's argument. At best, they indicate that Debtor was free to affiliate with other insurance companies and sell their products. Nevertheless, at Flint's request, Debtor agreed to place orders for Lincoln products exclusively through Lincoln and obtained a release from Zenith to permit the direct purchases.

It is apparent from his testimony that Flint did not understand that Debtor did not control all of the producers (or broker/dealers or agents) with whom he associated. In her cross-examination of Debtor, counsel for Lincoln seemed to indicate that Lincoln understood "Producers" to include any and all agents or brokers associated with PCG and that PCG could direct all of the associated producers to funnel their business through Lincoln. Clearly that was not Debtor's understanding or practice. At a minimum, Lincoln had notice that Debtor did not see his relationship with Lincoln to be an

33

exclusive one in the reference to "all other business" contained in Debtor's December 9, 2009 email to Zenith (P. Ex. 18).

Flint testified credibly as to his lack of knowledge that PCG had "independent agents" who could not be obligated to place orders for Lincoln products directly through Lincoln. He was not aware that these agents would continue to place a significant amount of orders for Lincoln products through third parties. Furthermore, there is no record that Debtor subsequently informed Flint that some of his independent agents would not be placing orders through Lincoln. Debtor testified, "The hybrid model was defined to me by [Flint] as a model where we would be a PCG general agent of Lincoln, but we could still have our outside relationships with other insurance carriers. But the goal was to bring as many producers under the Lincoln broker/dealer as possible but we also could have outside business as well." (Doc. no. 51, Trial Transcript, p. 172). It is not apparent from Debtor's testimony that he clearly explained to Flint that PCG independent agents would still be placing orders for Lincoln products through third party vendors. Yet, his failure to fully explain is not enough to prove intent to deceive. Even if it were probable that Debtor knew of Flint's lack of understanding and failed to correct the misunderstanding before he entered into the February Note and the Contract, it is not sufficient to prove that he fraudulently entered into any of the agreements without an intention to perform. The testimony reflects that Debtor had been in the insurance industry for a number of years and spent significant time building relationships. He had a solid earning history and had just ended an employment relationship that provided him significant compensation. The Court finds that, at the time Debtor signed the Contract and the February Note, he had every intention of building a relationship with Lincoln that would be profitable to both parties.

Finally, no evidence was presented that would help the Court understand the customary meaning, if any, of "producer" as Flint and Debtor used and understood the word. Nor was there evidence to show that Debtor's hybrid business model was untoward, illegal, or unusual. The Court sees the misunderstanding of the Debtor's relationships with his "producers," however that term is defined, to be just that, a misunderstanding.

(iii)   <u>Count III</u>  (Non-Dischargeability under 11 U.S.C. § 523(a)(2)(A) Related

to the Settlement Agreement)

Lincoln alleges Debtor entered into the Settlement Agreement with no intention
of fulfilling his obligations under it.  Debtor revoked his signature on the Settlement
Agreement soon after it was faxed to Lincoln.  As noted above, this Court granted partial
summary judgment to Lincoln earlier in this adversary proceeding finding that the
Settlement Agreement was valid and enforceable despite Debtor's attempt to reject it.  In
his opposition to Lincoln's motion for summary judgment, Debtor certified that he signed
the Settlement Agreement relying on an expectation that he would receive the funds to
make the payments required by the Settlement Agreement in short order.  He claimed
that, just after he signed the Settlement Agreement, he learned that the source of those
funds had dried up.  As a result, he knew he would not be able to comply with the terms
of the Settlement Agreement.  Lincoln did not address the Settlement Agreement or its
execution at trial, other than by providing documentation surrounding it in its Exhibit
Binders.  It offered no evidence of Debtor's alleged fraudulent intent when he entered
into the Settlement Agreement and did not develop the benefit Debtor may have received
from his execution of the Settlement Agreement.  Debtor's signature on the Settlement
Agreement caused Lincoln to cancel an upcoming arbitration hearing and delayed entry
of judgment against Debtor.  Without more, the delay is insufficient to support a finding
of non-dischargeability.   The Findings of Fact and Conclusions of Law as to Counts I
and II above ultimately determine the dischargeability of the debt that underlies the
Settlement Agreement.  The Court will not address it further in this Decision.

(iv)   Allegations as to Debtor's TOLI Program

The parties spent a significant amount of time highlighting their disagreement
about PCG's TOLI program.  Debtor contends that, because TOLI was a major source of
PCG's business, Lincoln's failure to approve its use prevented PCG from meeting its
projections, culminating in PCG's inability to repay the January Note and the February
Note.  According to Debtor, this software, which analyzed and rated insurance policies

from different insurance companies, was a major part of PCG's business and without it PCG's revenues were significantly weaker. Lincoln contends that any fault for the lack of approval of TOLI lay with Debtor.  Flint credibly testified that he was not aware of TOLI's significance to PCG's success.  Nevertheless, Flint and Lincoln worked to gain the approvals PCG needed for TOLI.  According to Flint, Lincoln was responsive to Debtor's requests.  Lincoln told Debtor what he needed to do to get TOLI approved, but Debtor failed to follow through.  Flint placed the blame for Lincoln's failure to approve Debtor's use of the TOLI program directly on Debtor.

According to Debtor, the alleged continued delay of the Lincoln compliance department to approve the TOLI software further strained the fledgling relationship between the two companies. As set forth above, Debtor emailed Flint on March 31, 2010, expressing his concerns and noting that "[i]f Lincoln had approved the TOLI program, there would be an additional minimum amount of $500,000 from the $2.5 million Zeiger has in underwriting."  (D. Ex. 21).  As Debtor explains in the email, Steve Zeiger was a partner of Debtor who continued to place orders through Zenith because the TOLI program had not been approved by Lincoln.  The email is consistent with Debtor's testimony that he believed Lincoln was aware that he had producers who continued to place orders through Zenith.  Notably, Lincoln made two more disbursements under the Contract, totaling in excess of $200,000, after Flint received this email.

Both parties submitted documents and testimony to support their different positions.  The Court need not determine fault in the failure to obtain approval of the TOLI program.  Debtor claimed that, if the TOLI program had been approved for his use at Lincoln, he would have had no trouble meeting his obligations to Lincoln. On the other hand, the Court was given no reason to believe that Lincoln intentionally denied approval of the TOLI program.  In fact, it appears Lincoln acted reasonably in its review of the TOLI program.

While PCG's inability to use the TOLI program may explain, in part, Debtor's inability to perform successfully under the Contract and the two promissory notes, it does not assist the Court in determining that the debt cannot be discharged.  Lincoln provided scant evidence to show Debtor knew at the outset that his use of the TOLI program would not be approved.  Debtor disclosed his use of the TOLI program from the beginning.  The

importance of the TOLI program may not have been clear to Lincoln, but the Court cannot find support for Lincoln's claim of fraudulent inducement in the confusion surrounding the TOLI program.  If anything, Debtor's concerns about approval of the TOLI program, as expressed to Lincoln in writing, do more to bolster Debtor's defense that he hid nothing from Lincoln and that, at the time he entered into the Contract and signed the two promissory notes, he had every intention of fulfilling his obligations.

## VI.    <u>CONCLUSION</u>

Lincoln failed to meet its burden of proving Debtor acted with intent to deceive Lincoln into entering into the Contract and advancing funds under the January Note and the February Note.  The Court finds that the witnesses testified credibly as to their understanding of the facts.   The Court finds that, at the time Debtor entered into the Contract and signed the promissory notes, he intended to perform as required.  Through his association with Lincoln, Debtor intended to continue working in a field in which he had over 18 years' experience and in which he had developed many relationships.

Debtor's obligation to Lincoln is discharged.  The Court will enter judgment consistent with this decision and the within adversary proceeding will be closed.

Dated:  4/24/17                              <u>/s/**Christine M. Gravelle**</u>
                                             United States Bankruptcy Judge